IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


RAEDEANE A. BELL-SHIER,          )     Civil No. 04-3045-JE
                                 )
              Plaintiff,         )     FINDINGS AND
                                 )     RECOMMENDATION
         v.                      )
                                 )
COMMISSIONER SOCIAL SECURITY     )
ADMINISTRATION,                  )
                                 )
              Defendant.         )
_____ )


          Tim D. Wilborn
          PMB# 294
          2020-C SW 8th Avenue
          West Linn, OR 97068

              Attorney for Plaintiff


          Neil J. Evans
          Asst. U.S. Attorney
          1000 S.W. Third Avenue, Suite 600
          Portland, OR 97204-2902



FINDINGS AND RECOMMENDATION - 1

Michael McGaughran
Thomas M. Elsberry
Social Security Administration
Office of General Counsel
Suite 2900, M/S 901
701 Fifth Avenue
Seattle, WA 98104-7075

    Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff Raedeane Bell-Shier brings this action for review of the final decision by the Commissioner of Social Security (the "Commissioner") denying her application for disability benefits under Titles II and XVI of the Social Security Act.  This court has jurisdiction under 42 U.S.C. § 05(g).  For the reasons set forth below, the decision of the Commissioner should be affirmed.

## Procedural History

Plaintiff first applied for disability benefits on or about February 11, 1998, alleging an onset date of July 15, 1997.  That claim was denied and she did not appeal.  A subsequent request to reopen that claim was withdrawn.  Plaintiff filed her present claim on or about April 13, 2000, alleging an onset date of July 17, 1999.  The Commissioner denied that claim.  All administrative appeals have been exhausted.

## Background

Plaintiff was 37 years old at the alleged onset date in 1999, and 39 at the time of the hearing before the

Administrative Law Judge ("ALJ").  The record suggests she is a less-than reliable historian and selective about revealing information.  Despite these impediments, the court has endeavored to sift the relevant facts from the record.

Plaintiff has a high school diploma.  Around 1985, she attended "some corrections officer training"--variously described as three or nine months in duration--but did not complete the training.  Plaintiff reportedly was an electricians' apprentice for around three years, but never completed her training.  She reports the apprenticeship ended after her supervisor had a heart attack.

Plaintiff's work history is sporadic.  Wage reports filed with the Social Security Administration ("SSA") reflect an assortment of low-paying jobs for different employers, most of short duration, with several significant gaps in employment. Plaintiff reportedly has worked, among other things, as a cook, bartender, temporary laborer, quality control checker (or perhaps assembler) in a furniture factory, an electrician's apprentice, and performed various tasks at a lumber or veneer mill.  She most recently was employed one day a week performing receptionist, secretarial, and sales duties, though she states that business was slow and she spent most of her work day playing games on the office computer.

Plaintiff reports she was in good physical condition until 1997, when she was 35 and employed at a wood products mill.  She developed a red rash on her nose.  It soon spread

to other body parts.  She says co-workers began calling her Rudolph.  On May 15, 1997, she suffered an acute incident at work and went to the emergency room ("ER").  The ER doctor suspected dermatitis from contact with fresh cedar.  Plaintiff eventually filed a workers compensation claim.  The record does not conclusively show whether she ever returned to work at the mill after the May 15 incident.

SAIF referred Plaintiff to a dermatologist, Dr. Clytie Rimberg, whom she saw on September 10, 1997.  Dr. Rimberg's chart notes say Plaintiff reportedly "stopped working in July and her face has improved somewhat, but the rest of the rash has gotten if anything worse.  She was treated initially in May with some antibiotics and steroids by mouth.  But since that time she has had no treatment other than some over-the-counter cream . . . .  Currently she is working only on the weekend as a bartender."[1]

Dr. Rimberg's tentative impression was "[s]ubacute cutaneous lupus," though "[c]hronic cutaneous lupus is also a possibility . . . which would be a less good prognosis."  An "anti-nuclear antibody" test was positive.[2]  Tests (for Sjogren's syndrome) were negative.  A biopsy revealed

---

[1]    Plaintiff reportedly was taking Vicodin for pain, though the medical record does not reflect a current prescription for Vicodin.

[2]    A positive test can be an indicator of lupus, but can also result from a variety of other causes.  See http://www.mayoclinic.com/health/lupus/.

"[v]acuolar dermatitis, consonant with subacute cutaneous lupus erythematosis."  A complete blood count was performed.

Plaintiff failed to appear for her next appointment.  The following time, she called and canceled.  That appointment was rescheduled.  Again, however, Plaintiff failed to appear. That ended her association with Dr. Rimberg.

On February 8, 1998, Plaintiff went to Three Rivers Community Hospital, with "a rash that is extensive over her body, including hands and feet."  She stated that "[s]he was diagnosed with lupus last July."  The ER noted that Plaintiff "has very little understanding of the disease and what this means."  Plaintiff also reported "some shortness of breath associated" with the rash.  Apart from the rash, a physical examination was unremarkable.  The ER diagnosis was "alleged lupus."  Plaintiff was referred to a rheumatologist, "advised of the seriousness" of lupus, and placed on prednisone (a steroid) for seven days.

On February 11, 1998, Plaintiff applied for social security disability benefits, claiming she had been disabled since July 15, 1997.

On February 20, 1998, Plaintiff saw Dr. Robert Gerber, who apparently specializes in rheumatology.  Plaintiff told Dr. Gerber she had been diagnosed with lupus "by Dr. Rimreck in Portland."  She probably meant Dr. Rimberg (there are no records from a Dr. Rimreck).  However, Dr. Rimberg appears to

have expressed only a tentative impression, and Plaintiff had not attended the followup appointments.

Plaintiff also told Dr. Gerber that, since May 1997, she had a rash on her face, limbs, and upper trunk, with malaise, periodic fevers to 101 degrees occurring at least monthly, substernal pain, and "kidneys hurting all the time." Plaintiff said her mother had scleroderma and a paternal aunt had lupus. Plaintiff also indicated she had been taking Valium and Desyrel for anxiety and to sleep.

Plaintiff also reported having "Raynaud's phenomenon," or perhaps described symptoms that Dr. Gerber interpreted as consistent with that condition.[3] Plaintiff did acknowledge that she "smokes cigarettes and drinks beer and wine regularly."

Dr. Gerber also noted Plaintiff "is very frightened, has poor appetite, reports fatigability, weight loss, night sweats, and sensitivity to heat and to cold. She has had some red eyes and diminution in her visual acuity. She has had

---

[3] Raynaud's phenomenon is characterized by spasms that constrict the blood vessels in the fingers or toes. The skin may change color, from pallor (whiteness), to cyanosis (blueness), to redness as the arterioles dilate. An attack can last from less than a minute to several hours. Raynaud's phenomenon can occur on its own, or it can be secondary to another condition such as scleroderma or lupus. It is more common in women, and may affect 5 to 10 percent of the general population in the United States. For most people, an attack is usually triggered by exposure to cold or emotional stress. Smoking can also be a contributing factor. See National Institute of Health, Department of Human Services, *Questions and Answers about Raynaud's Phenomenon*, available at http://www.niams.nih.gov/hi/topics/raynaud/ar125fs.htm.

dental problems with tooth excisions for dental caries.  She
has had periodic chest pain and cough ascribed to cigarettes.
She has frequent abdominal distress, belching, bloating and
alternating bowel habits without frank melaena or
hematochezla.  She does have nocturia up to five times nightly
. . . [and] frequent headaches, nervousness, sleeplessness,
depression . . . ."  Dr. Gerber also observed various skin
lesions, and that her wrists, knees and "MP joints" (the
metacarpophalangeal joints in the hands) were tender.

Dr. Gerber's diagnosis was (1) Systemic lupus
erythematosus ("SLE"),[4] and (2) substantial supravening
anxiety.  He prescribed prednisone, salsalate, plaquenil, plus
Desyrel at bedtime.  Dr. Gerber also certified Plaintiff as
"unable to work presumably until 06/01/98."

As Plaintiff had a pending disability application,
Dr. Gerber's report was reviewed by an SSA analyst.  He was
unimpressed, writing that Dr. Gerber's disability "opinion is

---

[4] Lupus is a chronic inflammatory disease in which the
body's immune system attacks its own tissues and organs.  Women
are far more likely to be afflicted.  Three main types of lupus
exist:  systemic lupus erythematosus (SLE), discoid lupus
erythematosus and drug-induced lupus.  SLE is the most common and
serious form of the disease, frequently causing swollen, painful
joints, skin rash, extreme fatigue and kidney damage.  No two
cases are exactly alike.  Signs and symptoms may come on suddenly
or develop slowly, may be mild or severe, and may be temporary or
permanent.  The disease often gets decidedly worse in episodes
called flares and may then improve or even disappear completely
for a time.  Although lupus can be a serious, even fatal,
disease, diagnosis and treatment of lupus have improved
considerably.  With proper care, many people with lupus can
lead normal, active lives.
See http://www.mayoclinic.com/health/lupus/.

not supported by any evidence in [the] file." On April 29, 1998, Plaintiff's first social security disability claim was denied. She did not appeal.

Dr. Gerber scheduled a follow-up appointment with Plaintiff for April 20, 1998. Plaintiff failed to appear. An appointment was scheduled for May 29, 1998, but she cancelled at the last minute. Plaintiff missed another appointment on November 16, 1998. Plaintiff may have seen Dr. Gerber a second time during 1998, though the record contains no details of such examination.

The record reveals relatively little else about Plaintiff's activities during 1998. She apparently was employed at some point, as her earnings records show $3,544 in gross wages. Some of that was earned bartending in Grants Pass. SSA earnings records also show employment with the "Oregon-Washington Pythian Home" in Vancouver, Washington, and "Winning Wheels" in Prophetstown, Illinois,[5] both of which apparently are nursing or retirement facilities. The precise nature of her employment is not clear, and Plaintiff did not mention those jobs in subsequent disability applications (or at least they do not appear in the documents included in the administrative record). Plaintiff later told a psychologist that she was drinking heavily around this time period.

_____

[5] Plaintiff spent some time in Chicago during 1998, for personal reasons.

FINDINGS AND RECOMMENDATION - 8

On October 12, 1998, Plaintiff saw Dr. Gentry for the first time.  She told him she had gained a lot of weight, had lupus, and was stressed and tired.  Dr. Gentry observed no evidence of "active" SLE upon examination, though that does not exclude the possibility it was dormant.  Plaintiff also advised Dr. Gentry that she smoked cigarettes, drank 1 to 2 glasses of wine, either daily or every other day, and had an alcohol problem in the past but did not have one currently.  She also complained of epigastric pain, for which he prescribed Zantac.

On February 24, 1999, Plaintiff went to the emergency room at Three Rivers Community Hospital, in Grants Pass, saying she had fallen and hurt her knee.  They determined it was not serious.  The ER noted she has "a history of some type of collagen vascular disorder that she has called lupus."

Around this time, Plaintiff began working through a temporary agency, being placed at various job sites.  She eventually obtained employment at a furniture factory (Bentwood) in Grants Pass.  She mostly worked as a quality control inspector, though they also tried her at other tasks such as loading and unloading machines.

In documents filed in support of her second disability application, Plaintiff states that she worked 5 to 6 days a week at Bentwood, for 8 to 10 hours a day.

On June 7, 1999, Plaintiff saw Dr. Gerber for the last time.  She complained of muscle pain and considerable anxiety.

She was fatigued, but working full time.  Dr. Gerber noted,
"She is much better actually than when I first saw her in
02/98."  She reportedly had been out of all her medications
"for some time."  Dr. Gerber's final diagnosis was (1) SLE
(i.e., systemic lupus erythematosus), and (2) chronic anxious
depression.  He prescribed salsalate (a non-steroidal anti-
inflammatory), hydroxychloroquine (often used to treat lupus
and arthritis); Trazodone (to be taken only at bedtime) (an
anti-depressant also used to treat anxiety, insomnia, and some
pain syndromes); and Lorazepam (for panic attacks).
Dr. Gerber scheduled an appointment to see Plaintiff again in
three months.

     On June 18, 1999, plaintiff saw Dr. Gentry.  According to
his chart notes, she was active at work, even climbing
ladders.  She had been out of her medications for some time.
He noted a history of panic attacks, chronic depression,
anxiety, and smoking.  With regard to lupus, Dr. Gentry
suspected that she was not regularly taking her
medications, and that this caused her to suffer flareups.

     On or about July 17, 1999, Plaintiff was fired from her
job at Bentwood, after calling to say she would be two hours
late.  Plaintiff says this was part of a pattern of attendance
problems; "I missed about 1 day of work every other week due
to my disability."  She says her "tiredness made problems with
showing up or being late a lot, and working with swollen or
numb hands made me to slow which caused problems with my

FINDINGS AND RECOMMENDATION - 10

emplorers."[6]  Plaintiff also says she was "fired because of my attendance but need[ed] to quit because of the problems with the Lupus."

Despite these problems, Plaintiff again failed to keep her appointment with Dr. Gerber.  He terminated her as a patient and told her to find another doctor.

On October 6, 1999, Plaintiff returned to the Three Rivers Hospital ER.  She reported that for four or five days, she had been experiencing body aches, pain in her arms and legs, joint pain, sore throat, high fever, and a rash.  The ER, unsure of the cause, prescribed antibiotics and referred her to Dr. Gentry, whom she saw the next day.  She told Dr. Gentry she had wrist and shoulder arthralgia, rash, and a high fever of six days' duration after doing a lot of painting.  Dr. Gentry confirmed that her hands, wrists, and forearms were swollen, and very tender, and she had a rash in various places.  He thought it could be a lupus flareup, triggered by a virus.  Dr. Gentry urged Plaintiff to see a specialist.  She said she could not afford it, and was trying to get on the Oregon Health Plan.

---

[6]  All quotes from plaintiff's application materials are as written, unless indicated.

FINDINGS AND RECOMMENDATION - 11

A Dr. Rasmussen subsequently examined Plaintiff and concluded the rash was probably "erythrma multiformi",[7] for which he prescribed prednisone for 60 days.

Plaintiff saw Dr. Gentry again on October 28, 1999. The rash, fever, and other symptoms were improving. However, she feared she was having a heart attack, reporting episodes of shortness of breath and rapid heart beat. She thought the Lorazepam helped. She was now on the Oregon Health Plan and AFDC, but still worried about money. She told Dr. Gentry that she was depressed, had trouble sleeping, and was having panic attacks.

Dr. Gentry discouraged her from using Lorazepam too frequently. He also encouraged her to quit smoking and gave her some literature on lupus (a topic on which she still had little understanding, in his view).

On November 10, 1999, Plaintiff told Dr. Gentry she wanted to quit smoking. She obtained a prescription for Nicoderm, but never followed through. That pattern recurred on other occasions. See, e.g., Tr. 226.

On December 16, 1999, plaintiff met with Dr. Eric Morrell, a licensed clinical psychologist. The session appears to have been initiated by Grants Pass Senior and Disability Services in connection with her application for social security disability benefits.

---

[7] Erythema multiforme is an allergic reaction with many potential causes.

Plaintiff told Dr. Morrell that she typically arose between 9 and 10, then sat around watching television, napping, smoking, and drinking coffee. She dressed around 3:00 p.m., when her boyfriend came home from work, and sometimes not even then. She walked the dogs "a couple of blocks" once a day, and prepared some meals. Her daughter and infant granddaughter resided with her. She went to bed around 7:30, but had trouble sleeping, awakening frequently. She occasionally drove, but did not have a valid license. She admitted using illegal drugs extensively when she was younger, and smoking marijuana recently, but denied using drugs during the interim. She drank heavily for several years, but claimed that had stopped a year ago. She was presently taking Darvocet,[8] Tylenol, Prednisone, hydroxychloroquine, Prozac, and Lorazepam. She said she experienced pain when performing repetitive motion tasks.

Dr. Morrell administered various psychological tests. He concluded she was of average intelligence, and her thought process was mostly logical. Her memory was generally adequate, but she exhibited "significant difficulty with both sustained and focused attention" on one test, and "markedly impaired performance consistent with significant inattentiveness" on a second test.

---

Again, the record does not reflect which physician prescribed that medication for her.

The interview and testing also suggested significant anxiety and depression, along with repression and denial. Dr. Morrell concluded that:

> Testing and evaluation are certainly consistent with a very somatoform profile in an individual who was the child of an alcoholic, comes from a chaotic household, has histrionic and dependent features . . . and inclined toward framing her difficulties as somatic when in fact they seem to be largely affective and anxiety-driven. Her testing is certainly consistent with a strong somatoform profile in a repressive individual, loathe to get in touch with the emotional underpinnings of her difficulties . . . . This is not to say that this individual is in any way intentionally misrepresenting. She simply exemplifies an individual who has a host of emotional and lifestyle stressors that she is likely to label as "medical" due to her lack of insight and repressive tendencies.
>
> From the neurocognitive standpoint, Raedeane experiences marked disruption of attention, largely evidenced by her extremely poor performance on the Conners Performance Test and the Digit Span -- both suggesting moderate impairment.  This is most likely a reflection of her affective condition, not suggestive of true organic factors (e.g., she scored within normal limits with good psychomotor speed on Trails A & B, and in addition, showed reasonable powers of memory on the Logical Memory I of WMS-R).  Her mental health condition would suggest mild to moderate difficulties in ADLs and social functioning; moderate difficulties in concentration, persistence, and pace (i.e., when Raedeane is more motivated, her attention powers seem to improve as was noted by the Trails test when she was under direct supervision and immediate contact with me) . . . . Her MRFC would suggest that at the present time she would experience severe difficulties with complex attentional information, leading to mild difficulties with memory. She demonstrated moderate difficulties in disruption of a normal work day due to psychologically based symptoms.

On January 11, 2000, Dr. Gentry prepared a Physical Residual Function Capacity Report ("RFC") for submission to the Commissioner in support of Plaintiff's application for disability benefits.[9]  It is difficult to read the handwriting, but Dr. Gentry appears to have stated her diagnosis was "old age"--she was then 37--that the "date of disability onset" was "birth," that her prognosis was "poor" and that Plaintiff was compliant with treatment.  Dr. Gentry also checked boxes indicating, with few exceptions, the greatest limitations on physical activity.

On February 6, 2000, Plaintiff went to the Three Rivers Hospital ER.  According to the chart notes, she had been a passenger in a pickup truck rear-ended the previous day while stopped at a stoplight.  The impact is described as "low speed" with "no significant damage to the vehicle."  Plaintiff was wearing a lap and shoulder belt, and "did not note any discomfort initially."  The following day, she complained of stiffness and neck pain.  The ER diagnosed an acute cervical strain.  X-rays showed "[l]oss of the normal cervical lordosis [which] suggests ligamentous injury versus muscular spasm." She was issued a cervical collar and Vicodin, and instructed to follow up with Dr. Gentry.

_____

[9]  This predates the filing of the present application, but post-dates the disposition of the first application.  It was either an application not included in the present record, or perhaps a motion to reopen the first application.

Plaintiff saw Dr. Gentry on February 16, 2000.  The speed
of the impact was now described as 25 mph.  Plaintiff admitted
she rarely wore the cervical collar.  She was taking Robaxin
and Tylenol.  Dr. Gentry found her range of motion intact, but
with "marked pain" at the endpoints.  He also noted cyanosis
in her hands, consistent with Reynaud's.[10]

On March 6, 2000, Plaintiff reported no improvement, and
continued pain.  She was prescribed Ultram (a pain reliever),
Robaxin (a muscle relaxant), and ibuprofen.  She had also been
receiving physical therapy.

On March 27, 2000, plaintiff reported she was "much
improved."  She was taking painkillers (and desired more), but
was not taking the muscle relaxants, which she said made her
tired.  Dr. Gentry urged her to stop taking pain pills, and
take the muscle relaxants instead.  He informed her he would
not renew her prescription for painkillers after this time.

On March 29, 2000, apparently unbeknownst to Dr. Gentry,
Plaintiff saw a chiropractor, Glen Litwiller, for the same
neck complaints.  By now, the impact speed had reached "25-30
miles per hour."  Instead of "much improved," as Dr. Gentry
reported, Litwiller's chart notes say she was still
experiencing significant pain and "has never been back

_____

[10]  Plaintiff's blood pressure appears to have been elevated
(182/100) on this occasion, and some others, though none of the
chart notes have commented on it.  Curiously, only six weeks
later, it was noted as 100/60.

to . . . normal" since the accident.  Litwiller concluded that "[b]ecause of the underlying lupus this will probably take quite a bit longer in the healing time than what we would normally expect."  His chart notes record her vocation as "painter" and state she is presently unable to perform that work.

By April, at the latest, Plaintiff had retained an attorney and was seeking damages for injuries allegedly sustained in the rear-end impact.  In addition, Litwiller reportedly had recommended that she re-apply for social security disability benefits.  On or about April 13, 2000, Plaintiff filed another disability application, this time alleging a disability onset date of July 17, 1999.

On April 17, 2000, Plaintiff saw Dr. Gentry again, and revealed that she was also seeing a chiropractor.  Gentry advised her against that, and recommended physical therapy instead.  Plaintiff was still complaining of pain, but had a full range of motion.

On May 1, 2000, Plaintiff completed a questionnaire regarding her disability application.  She stated that she was disabled because of "Systemic Lupus, Arthritis, Continus fever, fatigue, always tired, numb in hands, shortness of breath, kidney problems . . . my hands or numb most of the time, very tired, kidney promblems, joints in legs are sore with standing to long, rapid mood changes."  She also stated

that she was presently taking five medications, and that every

one of them made her tired.

Plaintiff also wrote,

Please help me to get what I've paid in for years I
need it bad, I cant work, I've gotten fired from
every last job for the last couple years.  I can't
function like I use to, I have no strength, I'm very
tired and being stressed out makes the lupus go
crazy I'd like one year to where I don't have to
worry where I'm going to live, eat.  This has been
going on for 3 years, I've lost everything my
childern, my house, my self respect . . . .

but just knowing I've worked since 14 and payed in to
benifit my furture, well now I need it serisously so I
might have a chance to hear to help my daughter and my
new grandbaby cope, for she is only 17 and is a good
girl, I help her all I can, but I cant when Im just
getting worse, next week I'm being fitted for a kane
hopefully just temperary but since I fall in the Safeway
and at 37 that I couldnt get up as I use to.  Its
embarrassing, I hate it, I love working, doing new
things, but I cant do it any longer I'm tired and sure Im
young but I'm falling apart and the more I stress the
worse I get' Im tired, tired, maybe say I go to work 2 or
3 months Im fired and it due to the lupus & being tired.
This is really making me lose my mind, I am very ill, Its
not visable on the outside of me, but my insides are
wearing out!! The 1st 3 to 4 hours after waking up my
hands a all different colors numb cold and it takes til
noon or later before I can use them, then when when I
think the feel is back there is no strength and over
these 3 years i[t] has won.

One question on the form asked, "Would you like to

receive rehabilitation services that could help you get back

to work?"  Plaintiff responded, "No I cant work."

FINDINGS AND RECOMMENDATION - 18

On May 3, 2000, Plaintiff told Dr. Gentry that she was 80-85% improved from the auto accident injuries, and wanted to discontinue physical therapy because it was no longer needed. His chart notes reflect a full range of motion and little pain.

Plaintiff also told Gentry that Dr. Gerber had terminated her as a patient for missing appointments, and she was out of lupus medications.  This actually had occurred eight months earlier, so she presumably had gone many months without those medications and without a replacement rheumatologist. Dr. Gentry authorized a one-month supply of lupus medication, while she found a specialist to replace Dr. Gerber.

On May 26, 2000, Plaintiff saw chiropractor Litwiller. She told him her neck was improved, but now the lupus was a problem.  She also told him her unemployment insurance had run out, but she was continuing to seek social security disability benefits.

On June 13, 2000, Litwiller reported that she was "really not in all that much pain any more."  On July 5, 2000, he noted she "has been doing really quite well" though lupus keeps her from "doing the heavy activities as she was." Still, Litwiller considered her to be "medically stationary" and did "not see any reason for permanent impairment from this injury."

On July 21, 2000, however, Litwiller wrote that "Raedeane has had an acute flare-up in her symptoms again for no apparent reason."  She complained of intense headaches and neck pain.

On July 25, 2000, Plaintiff went to the Three Rivers Hospital ER, complaining of shortness of breath, lightheadedness, and a sharp pain under her right breast. All tests were normal, and the preliminary diagnosis was hyperventilation.

On August 1, 2000, Plaintiff told Litwiller she was in a lot of pain again.  Litwiller wrote, "She is still not, in my opinion, able to do really any work.  I would prefer that she continue to proceed through the Social Security process as much as possible."

That same day, Oregon DHS asked Litwiller if Plaintiff was well enough to seek work.  Litwiller said she was not. "Patient is totally disabled and applying for social security benefits."  He estimated the duration of her disability as "indefinite."

On August 9, 2000, Litwiller spoke with a social security representative.  Litwiller then wrote, "It is my opinion that her disability in terms of Social Security is a result of the lupus."

On August 10, 2000, Litwiller wrote that Plaintiff was worse, with headaches and neck and back pain "affecting her quite severely."

On August 16, 2000, the Commissioner issued her initial denial of benefits.  Included in the denial was the opinion of Robert Henry, a non-examining psychologist retained by the Commissioner, who opined that Plaintiff had no psychological problems apart from mild anxiety that did not impair her ability to work.  The Commissioner also concluded that Plaintiff's claimed symptoms were disproportionate to the objective evidence, and her subjective account of her symptoms was not fully credible.

On August 25, 2000, Litwiller wrote that Plaintiff is "doing much better" and "had some pretty good results with the Voc Rehab assistance that the State is apparently doing for her."  "She is not as depressed."  The chart note mentions her wanting to "get back at least to a part time light duty classification" though she "still is filing for the social security disability, however."

Plaintiff saw Litwiller again on September 5, 2000.  She complained of neck pain and headache.  They again discussed retraining and education, but she "continues to pursue the legal route for the disability."

On or about September 27, 2000, Plaintiff saw Dr. Gary Wheeler, a rheumatologist, for the first time.  He ran a

series of blood and urine tests.  The ANA test was positive, which is consistent with lupus (among other things).

Dr. Wheeler subsequently wrote a letter to Dr. Gentry, summarizing his preliminary conclusions.  Plaintiff told Dr. Wheeler she had not taken her lupus medications in over two months.  She complained of fatigue, weakness, low grade fever at times, daily occipital and bi-temporal headaches, short term memory loss, difficulty with her vision, itching in her scalp, night sweats, urinary frequency, dyspepsia, easy bruising, difficulty breathing at night, and non-restorative sleep cycles.  She sometimes fears she is having a heart attack, and perceives her heart is beating irregularly.  She said her neck and shoulders still ached from the car accident.

Plaintiff told Wheeler that her father had three heart attacks, her mother had a stroke, diabetes, and scleroderma, and her sister has uterine cancer.  Plaintiff also admitted smoking a pack of cigarettes a day for 25 years.

According to Wheeler's notes, "Generally, she views herself as functioning poorly."  She says "the hardest activity she is required to do is functioning in the morning hours because of tightness and soreness.  She has an attorney and has filed for disability for the third time last month. She is currently receiving chiropractic treatment for her whip lash injury and has not yet resolved litigation regarding the MVA."

FINDINGS AND RECOMMENDATION - 22

While her physical exam was mostly unremarkable, "[s]he demonstrated a mild to moderate amount of chronic pain behavior.  She has the trigger point tenderness typical of fibromyalgia involving the upper as well as the lower back."

"I believe Ms. Bell's primary difficulty is that of fibromyalgia and a myofascial pain syndrome.  I do not find any evidence that she has active SLE at this time.  Her level of complaints are disproportionate to objective findings and with her chronic pain syndrome her current litigation and applications for disability make secondary gain possible contributing factors to her overall level of poor functioning."

In late September or early October, Plaintiff was (apparently) placed by a State agency at a company called ESAM, to perform small parts assembly.  This job appears to have lasted about a week or two before she quit.

On October 6, 2000, Plaintiff told Litwiller she had pain in the upper back and neck, and a severe headache.  "She started work this past week on Monday where she was working at ESAM now in a bent over postur[e].  That has totally flared-up the muscle pain."  On October 13, 2000, Litwiller wrote that she is "doing a little better since she quit her job.  She has not been able to handle a seven day week job.  They would not allow her to go to a five day week."

On October 31, 2000, Litwiller wrote that "she really has not even had distress since she was last seen."  She had normal range of motion, for the most part.  He considered her asymptomatic, and saw no need to continue treating the neck injury.

On December 5, 2000, the Commissioner denied Plaintiff's application for benefits on reconsideration.

Beginning in October 2000 (according to some reports) or early 2001 (according to other sources), Plaintiff began working one day a week for Matrix Bio Scientific in Grants Pass.  She performed receptionist, secretarial, and sales duties, but later stated that business was slow and she spent most of the work day playing games on the office computer.  That job lasted until she was laid off in July 2002.  Plaintiff chose to limit her hours to one day a week, stating that was all she was able to do.

Around this time, Plaintiff got married.

On January 15, 2001, Dr. Wheeler saw Plaintiff again. She reported that she was still "tired, fatigued, has some generalized arthralgias and feels like she has the 'flu' all the time."  However, she "had no specific symptoms suggestive of active SLE . . . ."  "She has a non-restorative sleep pattern.  She has various aches and pains and feels tired all the time . . . [and] continues to have the trigger points typical of fibromyalgia."

He recommended increasing the Trazodone dosage in an effort to help her sleep.  He also recommended adding Plaquenil "in that I cannot completely exclude an element of SLE although I suspect there are other factors contributing to her difficulties."  He proposed to see her again in three to six months.

On January 19, 2001, Plaintiff saw Dr. Gentry.  She complained of epigastric pain.  He suspected it was attributable to her extensive consumption of non-steroidal anti-inflammatory drugs ("NSAIDs"),[11] and prescribed Tagamet.  A subsequent note indicates that Tagamet improved her symptoms, but the dosage was increased.

On February 8, 2001, Plaintiff complained to Dr. Gentry's office that Dr. Wheeler had temporarily discontinued "all her meds for a while."  As a result, she said, she was miserable and "really locked up" until Wheeler finally renewed her prescriptions for Trazodone, Lorazepam, and ibuprofen.[12]  She also complained that she "continues to have generalized arthralgias and feels like she has the flu all the time.  She experimented with some marijuana and found that it gave her

---

[11]    In a report filed December 4, 2000, her attorney said Plaintiff consumed six to ten tablets, each, of ibuprofen and aspirin every day.  See also Tr. 108 (she takes "lots of asprin" [sic]).

[12]    Trazodone and Lorazepam are generally used to treat anxiety, insomnia, and depression.

FINDINGS AND RECOMMENDATION - 25

good relief and she would like to apply for medical marijuana
on the State program . . . ."

Dr. Gentry noted that she was working one day a week, and
seemed pleased that she was able to do that.  She seemed to be
moving reasonably well, but was depressed and teary.

> Kind of a generalized syndrome typical of a lupus
> and fibromyalgia sort of patient.  I'm not sure that
> she quite fits the criteria but fortunately that's
> not my final decision and certainly a little
> marijuana that gives her significant relief might be
> the easiest way to manage a difficult constellation.

During this appointment, Dr. Gentry agreed to prescribe
medical marijuana for Plaintiff.  However, the record suggests
she never took the steps necessary to obtain formal approval.

On March 6, 2001, Dr. Gentry noted that Tagamet seemed to
be helping Plaintiff's epigastric pain.  "I have advised that
she can gradually wean off this medicine, but that if her
symptoms recur, she will have to go back on it.  Given the
nature of her chronic use of NSAIDS, she may well have to be
on it for the long term."  Plaintiff also complained of some
increased hip, knee, ankle and neck pain.

Plaintiff saw Dr. Wheeler again on April 30, 2001.  He
advised Dr. Gentry that she was "continuing to have various
arthralgias, myalgias, and some generalized pruritis without a
definite skin rash.  She has no other symptoms suggestive of
active SLE although [she] reports that she is tired of being
on the 'roller coaster' feeling well some days and not as well

FINDINGS AND RECOMMENDATION - 26

on others.  Her other medications remain unchanged."
Plaintiff also reported that she took a Valium for anxiety
(obtained from a relative) and decided it worked better than
the Lorazepam she was taking.

Plaintiff had good range of motion, and no skin lesions,
but "continues to have the trigger point tenderness typical of
fibromyalgia."  Dr. Wheeler also suggested increasing her
Trazodone dosage.

On July 18, 2001, Plaintiff told Dr. Gentry she was
suffering from depression, anxiety, and averaging two panic
attacks a day.  She was crying in his office.  She said she
had tried Prozac and Paxil, but neither worked, and Trazodone
makes her tired.  She was taking four Lorazepam a day.  He
gave her some Zoloft, and suggested she seek professional
counseling.  She also described other symptoms that he
attributed to panic attacks.

Plaintiff saw Dr. Gentry again on August 6 and
September 5, 2001.  She was still depressed and anxious.  She
said she was deriving some benefit from Zoloft, but could not
afford counseling.

On October 17, 2001, they discussed the same issues
again.  She also complained of chest pain, radiating into her
jaw, and a racing heart.  She reportedly told Dr. Gentry that
her father had five heart attacks, the first at 37, and her

mother had six heart attacks, the first in her 40s.  He gave her some nitroglycerin, and referred her to a cardiologist.

On October 30, 2001, Cardiology Consultants performed a "dipyridamole dual-isotope myocardial perfusion scan." The results were "likely normal but with a very modest redistribution in the anteroseptum coupled with her intensely abnormal family history would recommend cardiology consultation and further invasive testing if clinically indicated."

Plaintiff saw Dr. Gentry again on November 6, 2001, and reported that she was having episodes of chest pain on almost a daily basis.  She said it was relieved by nitroglycerin in approximately five minutes; otherwise, it lasts 30 minutes. She was still smoking and was chronically fatigued.  A lipid panel showed high cholesterol levels.

Plaintiff saw Dr. Wheeler again later that month.  He noted occasional arthralgias, myalgias, fatigue, and some generalized pruritus without a rash.  "She has had no definite symptoms suggestive of active SLE . . . .  She continues on her Plaquinil, Trazodone, Lorazepam."  She had some trigger point tenderness.  She recently tried Wellbutrin but did not like the side effects.

He suggested she decrease the Trazodone and Lorazepam, given her complaints of daytime sleepiness.

On January 8, 2002, Plaintiff missed her appointment with Dr. Gentry.  In February 2002, Plaintiff told Dr. Gentry that her mother had recently died, and she was very depressed. Plaintiff saw Dr. Gentry again on June 11, 2002.  Depression was still a major concern, but she insisted that she could not afford counseling.

A hearing was held before ALJ Elliott on August 14, 2002. On September 25, 2002, the ALJ issued his decision denying benefits.

## **Legal Standards**

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Disability claims are evaluated according to a five-step procedure.  Baxter v. Sullivan, 923 F.2d 1391, 1395 (9th Cir. 1991).  The claimant bears the burden of proving disability. Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989).

First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. § 404.1520(b).

In step two the Commissioner determines whether the claimant has a "medically severe impairment or combination of

impairments." <u>Yuckert</u>, 482 U.S. at 140-41; § 404.1520(c).  If not, the claimant is not disabled.  Step two establishes a relatively low bar, serving mainly as "a de minimis screening device [used] to dispose of groundless claims." <u>Smolen v. Chater</u>, 80 F.3d 1273, 1290 (9th Cir. 1996).  Claims are denied at step two only if that result is "clearly established by medical evidence." S.S.R. 85-28 (1985); <u>Webb v. Barnhart</u>, 433 F.3d 683, 686-67 (9th Cir. 2005).

In step three the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yukert, 482 U.S. at 140-41; § 404.1520(d).  If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. <u>Yuckert</u>, 482 U.S. at 141.

In step four the Commissioner determines whether the claimant can still perform "past relevant work." § 404.1520(e).  If yes, she is not disabled.  Otherwise, the burden shifts to the Commissioner, in step five, to show that the claimant can perform other work. <u>Yuckert</u>, 482 U.S. at 141-42; § 404.1520(e) & (f).  If the Commissioner meets her burden and proves that the claimant can perform other work existing in significant numbers in the national and regional economies, the claimant is not disabled. 20 C.F.R. § 404.1566.

The court may set aside the Commissioner's denial of disability insurance benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Baxter, 923 F.2d at 1394. Substantial evidence is "more than a mere scintilla" but "less than a preponderance." Id. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id.

## Discussion

The ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act during the period between July 17, 1999, and August 14, 2002, the date of the hearing. At step one, the ALJ determined that Plaintiff's work activity since the onset date was either not substantial enough to constitute "substantial gainful activity" (in the case of her part time work) or was an "unsuccessful work attempt" (her brief full-time work as an assembler).

At step two, the ALJ acknowledged that systemic lupus erythematosus, fibromyalgia, and anxiety disorder constitute medically "severe" impairments that, under some circumstances, can be disabling.

At step three, the ALJ concluded that Plaintiff's impairments, whether singly or in combination, had not, for any continuous 12 month period, been equivalent in severity to

the criteria of a condition listed in Appendix 1 to Subpart P
of the Regulations.

At step four, the ALJ determined that Plaintiff was
unable to perform her past relevant work.  The burden
therefore shifted to the Commissioner to establish the
existence of a significant number of jobs in the economy that
Plaintiff can perform given her vocational characteristics and
residual functional capacity.

At step five, the ALJ found that the Commissioner had
satisfied this burden.  The ALJ cited three examples of such
work:  reception clerk, storage facility rental clerk, and
surveillance systems monitor.  Consequently, the ALJ
concluded, Plaintiff was not entitled to disability benefits.

Some portions of the ALJ's analysis are flawed, as
explained below.  Nevertheless, the ALJ's ultimate conclusion
is supported by the record as a whole.

Lupus and fibromyalgia can sometimes be disabling.
However, it is not clear whether Plaintiff actually has either
or both conditions, let alone of a severity sufficient to
preclude her from working for a continuous period of at least
12 months.  In part, this uncertainty reflects the nature of
those conditions, which are not easily diagnosed or readily
verified by objective findings.  Lupus and fibromyalgia can
also mimic other conditions, and symptoms may wax and wane.

Further complicating matters are Plaintiff's repeated failure to attend scheduled medical appointments or to comply with treatments prescribed by her doctors, along with an apparent propensity to self-medicate.  A careful review of the record also suggests that Plaintiff is an unreliable historian who sometimes withholds relevant information from her doctors and the Commissioner.  In addition, as the ALJ noted, her subjective complaints and accounts of her limitations are difficult to credit fully.

Plaintiff contends the ALJ's credibility findings were erroneous.  Unless there is affirmative evidence showing that the claimant is malingering, clear and convincing reasons are required for rejecting the claimant's testimony.  <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998).  The ALJ must perform two stages of analysis: the <u>Cotton</u> analysis plus an analysis of the credibility of the claimant's testimony regarding the severity of her symptoms.  <u>Smolen v. Chater</u>, 80 F.3d 1273, 1281 (9th Cir. 1996).

With regard to malingering, there is some evidence suggesting Plaintiff was not very motivated to work more than occasionally, generally being content to seek benefits (both fiscal and emotional) from a perceived inability to work.  In addition, despite her relatively young age, the record contains no evidence she sought job training or education that could qualify her for less strenuous positions, or for more

jobs in the local workforce.  Nor is there much evidence she aggressively solicited employment at anytime following the incident of May 15, 1997.  Perhaps she did, but it is not reflected in this record.  Dr. Wheeler also opined that secondary gain might be a motivating factor, albeit he wrote that following her first visit.  Some statements in Plaintiff's application for benefits raise similar concerns.

Weighing in Plaintiff's favor are Dr. Morrell's psychological report, which found no evidence that Plaintiff was consciously malingering, and the part-time job she held for over a year.  Since the evidence of malingering is mixed, I will examine the remaining two components of the credibility analysis.

Under the test articulated in Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986), a claimant who alleges disability based on subjective symptoms must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged.  Smolen, 80 F.3d at 1281.  Importantly, for present purposes, the claimant need not show, at this stage of the analysis, "that her impairment could reasonably be expected to cause the *severity* of the symptom she has alleged; she need only show that it could reasonably have caused *some* degree of the symptom."  Id. at 1282 (emphasis added and internal citations omitted).

Lupus can, in some instances, give rise to at least some of the claimed symptoms. This assumes Plaintiff has active systemic lupus, though the evidence supporting that diagnosis is problematic.

If a claimant satisfies the <u>Cotton</u> test, and assuming there is no affirmative evidence suggesting she is malingering, the ALJ may reject the claimant's testimony regarding the severity of her symptoms only by giving clear and convincing reasons for doing so. <u>Smolen</u>, 80 F.3d at 1283-84.

The ALJ met that standard, although I cannot endorse all of his reasons.[13]

---

[13] The ALJ improperly relied on the time lapse between the dates Plaintiff was treated. For instance, he opined that a two month "gap in treatment frequency . . . is not suggestive of any chronic or disabling symptomatology" and that a two-and-a-half month gap in physician visits "is not consistent with disability under the Social Security Act." That is a serious overstatement. A patient may be severely impaired, yet the doctor has already done all he can. Nothing more can be done except to monitor the patient for any new developments. The doctor may also be unsure of the cause of the patient's symptoms, such as extreme fatigue, yet the patient's condition appears stable. "Call me if there are any new problems; otherwise, I'll see you back in three months." The patient's ability to pay for medical care, the distance that she must travel, and the doctor's own schedule, can also be important factors in the frequency of appointments. Plaintiff's medical records show it was often the doctor who determined the interval between visits, apart from instances where Plaintiff simply failed to appear for a scheduled appointment.

The ALJ also thought it noteworthy that Plaintiff "has not required frequent emergency room intervention and has never been hospitalized for the treatment of any condition she alleges to be disabling for the purpose of this adjudication." The applicable statutes and social security disability regulations contain no such requirement. The ALJ erred by erecting one.

FINDINGS AND RECOMMENDATION - 35

The ALJ found that Plaintiff had a "propensity for exaggeration."  Plaintiff complains that the particular example the ALJ gave in his opinion is unfair.  However, the record contains other instances that support the ALJ's finding.  For instance, Plaintiff testified at the hearing that "I feel like I am literally dying right now."  Tr. 294. That appears to greatly overstate the severity of her condition.

Also illustrative is the questionnaire completed in August 2000 by Plaintiff's friend, Charlotte Widman, which represents that Plaintiff "has a bad health problem - we are afraid we may lose her" and that Plaintiff must take medications just to stay alive.  This appears to greatly overstate Plaintiff's known medical condition at the time.  Presumably Widman's statements were based on information conveyed by Plaintiff, which may reflect Plaintiff's own fears and anxieties or inability to comprehend what her doctors told

---

The ALJ also erred by relying on the supposed absence of corroborating statements in the medical record proving that Plaintiff made the very same statements to her doctors about her limitations that she had made in her submissions to the SSA. Medical records are rarely a verbatim account of what the patient said, but rather an attempt to summarize what the person who recorded the data deemed relevant.  The record is replete with statements from Plaintiff to her doctors that she was constantly fatigued, in pain, and unable to work.  Whether the ALJ believes the statements Plaintiff made to her doctors may be another matter, but they were made.

The ALJ also employed circular logic by insisting that Plaintiffs' reported symptoms could not be credible simply because they are not supported by objective clinical evidence.

her.  Regardless of the reason, it is part of a pattern of overstatements.

A "low-speed" impact with no significant damage or injury quickly grew into a 25-30 mph collision with many months of chiropractic treatments, and what Plaintiff now contends was permanent injury.  The extent of the injury, and speed of the accident, seems to have grown commensurate with secondary gain motivators such as claims for disability benefits and personal injury damages.

Plaintiff complains of kidney problems in her disability questionnaires, and occasionally to her doctors, yet nothing in the medical records points to a medical basis for those assertions, and there is little evidence her doctors took those complaints very seriously.  Her disability application says she was being fitted for a cane, yet I recall no mention of that in her medical records.

Dr. Morrell's psychological evaluation, though assuming she was not intentionally misleading, also commented on Plaintiff's propensity to depict her anxieties and life stresses as medical problems, and her inclination and ability to portray herself in the light she perceives as most favorable for her purposes.

Other evidence also lends support to the ALJ's finding that Plaintiff's subjective description of her symptoms and limitations cannot be credited fully.  For instance, when

Plaintiff was terminated by Bentwood for being absent or late too often, she attributed this to her alleged "disability," claiming she was exhausted after working long days at the factory.  However, Plaintiff repeatedly missed doctor's appointments, over a period of years, even though she was no longer working and supposedly was spending most of her days resting.  Thus, it seems likely that other factors contributed to Plaintiff's tardiness and absenteeism at Bentwood.

Plaintiff initially claimed that she was disabled starting in 1997.  However, she held a number of jobs during 1998 and has stated that she worked very long hours at the furniture factory during the first half of 1999.  Plaintiff appears to have been overly anxious to declare herself disabled and begin collecting benefits, without making the kinds of efforts to continue working that the court has observed in many other applicants who legitimately desire to work but truly are unable to do so.

Plaintiff's failure to maintain a valid driver's license --a virtual necessity for employment given her choice to live in a rural location--and the doubtful explanation she gave for not having a valid driver's license, further undermine her credibility and cause the court to question her desire to be gainfully employed.

Plaintiff also appears to have been less than candid about her alcohol and drug usage, or the extent it contributes

to her symptoms.  She gave different accounts to different
doctors, and evaded the question entirely on a questionnaire
submitted to the SSA.  Tr. 111.  She may also have been less
than candid about her whereabouts during some time periods.

While I disagree with some of the reasons the ALJ gave
for not fully crediting Plaintiff's testimony, the ALJ's
ultimate conclusion is supported by the record.  No purpose
would be served by remanding to the ALJ for additional
findings.

Plaintiff next argues that the ALJ did not give due
consideration to the side effects of three medications she
takes: NSAIDs, Tagamet, and Trazodone.  The only side effect
she claimed from ingesting NSAIDs was epigastric pain that was
relieved by Tagamet.  This is not unlike the routine gastric
reflux that millions of employees contend with every day.  It
is not disabling.  Plaintiff points to no side effects from
Tagamet.  Finally, although Trazodone can cause sleepiness,
Plaintiff was repeatedly told to take that medication only at
bedtime.  The record does not establish that use of this
medication, as prescribed, would prevent her from working.  If
anything, the record suggests that any daytime somnolence may
well have been exacerbated by Plaintiff's ingestion of other
substances, both prescription and otherwise, and her
consumption of alcohol while taking certain prescription
drugs.

Plaintiff contends the ALJ improperly failed to consider her depression, chest pain, and epigastric pain. This omission did not affect the result. Her epigastric pain is discussed above. Her occasional chest pain was attributed to panic attacks, not a heart condition or other medical problem.[14]  Once Plaintiff was assured that it was not indicative of a serious problem, this should not have precluded her from working.

The ALJ did not discuss Plaintiff's depression, largely because Dr. Morrell's psychological report was not shown to the ALJ.  Dr. Morrell's report was considered by the Appeals Council,[15] which found no basis to reverse the ALJ's ruling.  I agree.  Dr. Morrell's report does suggest that depression plays a significant role in Plaintiff's life and ailments, but the report does not suggest that Plaintiff was disabled as of that writing (in December 1999).  The ALJ recognized that anxiety was an issue, and factored that into his analysis.  He assumed that she was precluded from performing "skilled" or hazardous work.  Depression was also noted in her other medical records.

---

[14]  Plaintiff was issued nitroglycerin, but it does not appear to have been the result of any documented cardiac abnormality.

[15]  I reject the government's contention that the Morrell report is not properly in the record and cannot be considered by the court.  It is not "new" evidence but was prepared in 1999. The agency itself considered Dr. Morrell's report in reaching its final decision.  The line of cases cited by the government concerns a different issue.

Although Plaintiff has not reported any episodes of decompensation at work, her panic attacks and other anxiety issues could potentially contribute to such an episode. This was not expressly discussed in the ALJ's opinion, probably since Dr. Henry failed to identify such restrictions in his report to the Commissioner. Nevertheless, there seem to be an adequate number of jobs plaintiff can perform that do not involve high levels of stress.

Plaintiff next contends the ALJ erred by declining to credit Dr. Gentry's RFC dated January 11, 2000. It is difficult to read the handwriting, but Dr. Gentry appears to have stated that Plaintiff's diagnosis was "old age"--she was then 37--that the "date of disability onset" was "birth," that her prognosis was "poor" and that Plaintiff was compliant with treatment. Dr. Gentry also checked boxes indicating, with few exceptions, the greatest limitations on physical activity. The record, including his own chart notes, simply does not support those conclusions, with the possible exception of some restrictions on exposure to extreme environmental conditions. It appears that Dr. Gentry may have been trying to assist his patient to obtain benefits.[16]  The ALJ had adequate grounds for

---

[16]    Dr. Gentry later endorsed Plaintiff's request for medical marijuana notwithstanding it was very doubtful she met the legal requirements, or that smoking marijuana would benefit an individual complaining that she was always tired.  Plaintiff indicated that marijuana helped her sleep, but that assumes her consumption was limited to that purpose, and did not cause any residual somnolence later.

FINDINGS AND RECOMMENDATION - 41

not accepting Dr. Gentry's RFC.   Likewise, the chart notes of
chiropractor Litwiller express so many changing assessments,
often conflicting with the contemporaneous observations of
other doctors, and are so intertwined with secondary gain
issues, that they are not entitled to much weight.

Lastly, Plaintiff disputes the ALJ's finding that she is
capable of performing jobs that exist in significant numbers
in the regional and national economy.  The record adequately
establishes that Plaintiff is capable of performing the duties
of storage facility rental clerk or receptionist/clerk, even
if, as Plaintiff contends, the ALJ erred by not making
explicit findings regarding transferable skills.  Not every
error by an ALJ is prejudicial or grounds for reversal.

Plaintiff also argues that she is incapable of performing
the jobs identified by the Vocational Expert because she must
nap all the time.  That argument relies upon Plaintiff's
subjective description of her own limitations, which the ALJ
was not required to credit.[17]

Finally, Plaintiff argues that the ALJ's finding that
there are a significant number of jobs she can still perform
was premised upon a finding that all "three jobs [discussed by
the vocational expert] in combination exist in significant
numbers."  Plaintiff's Opening Brief at 19 (emphasis in

---

[17]   Plaintiff may in fact spend most of her typical day
sleeping, eating, smoking, and watching television, as she
testified, but the record suggests that she is capable of
following a more demanding schedule when necessary.

original).  Ergo, Plaintiff concludes, if there is doubt about her ability to perform any one of those jobs, then there are no longer a sufficient number of jobs she can perform and the ALJ must find that she is disabled.  The short answer is that the Vocational Expert was simply giving a few examples of the kinds of jobs that she can do.  The Vocational Expert did not suggest, nor is there any reason to believe, that those are the only three jobs in the national economy that she can perform.

Ultimately, although the ALJ's opinion has some flaws, the errors do not diminish the court's confidence in the correctness of the final conclusion.  No useful purpose would be served by remanding this matter to the ALJ to correct those errors.

Nothing I have said is intended to preclude Plaintiff from seeking benefits for any period of time after August 14, 2002.  Her condition may have changed since that date, or medical science may someday provide more satisfactory answers.

### Recommendation

The decision of the Commissioner should be affirmed and this action dismissed.

### Scheduling Order

The above Findings and Recommendation are referred to a United States District Judge for review.  Objections, if any, are due May 23, 2006.  If no objections are filed, review of

the Findings and Recommendation will go under advisement on
that date.

A party may respond to another party's objections
within 10 days after service of a copy of the objection.
If objections are filed, review of the Findings and
Recommendation will go under advisement upon receipt of
the response, or the latest date for filing a response.

DATED this 5th day of May, 2006.


/s/  John Jelderks
John Jelderks
U.S. Magistrate Judge